The opinion of the court was delivered by
Nicholls, C. J.
The conclusions we have reached in this case make unnecessary any examination of the question whether plaintiff, would be entitled to damages for the crossing of its tracks (laid upon the streets of the city of New Orleans), by another road, when such crossing was made under authority of the city authorities so to do, and if so, what the character of such damages would be, and whether plaintiff, if entitled to such damages, would be entitled to enjoin the second road from making the crossing until it should have previously made compensation to it for such damages.
We will confine ourselves to the single proposition whether under the law the Common Council of New Orleans had the power and authority to make the grant embodied in Ordinance No. 10,392. Plaintiff as a taxpayer maintains that it has not, and relies in support of that position upon the fourth section of Act 135 of 1888, which declares that the Common Council “ shall not have power to grant, renew or to sell or dispose of any street railroad franchise, except after at least three months’ publication of the terms and specifications of said franchise, and after the same has been adjudicated to the highest bidder by the Comptroller, as provided in Sec. 21 of the city charter.”
In discussing this question in East Louisiana Railroad Company vs. City of New Orleans, 46 An. 526, we said that the “ section of the act manifestly applied to street railway franchises, granted for the purpose of operating a road exclusively within the city limits. It did not apply to railroads carrying the mails, and transporting freight and passengers long distances beyond the limits of the city. The Legislature never intended, and in the nature of things such intention would be impracticable in execution, to cause railroads coming into the city from a distance to have the franchise of a right of way. No latitude of construction could *1558 make the provisions of Sec. 4 extend to other than roads which are operated exclusively within the corporate limits. The fact that plaintiff’s road reached the city over another road did not change its character into a street railway. Its attempt to reach the road over which in part it ran its trains was a matter of convenience. Its destination was still beyond the city limits, and practically it was a continuous line of road from the city to its objective point, Covington. If it ran its trains only from its intersection with the Northwestern Railroad within city limits and carried passengers and freight between those points it would be classed as a street railway and come within the purview of Sec. 4. But that was nob a fact. The object of the plaintiff company was to carry freight on its own cars beyond the city limits to Pearl River Station, where they would reach their own roadbed. As the road of plaintiff was not a street railway the City Council had the power to grant the franchise without requiring a compliance with Act 135 of 1888. Art. 243 of the Constitution. Consent only was necessary bo grant the privilege of a right of way to a railroad running beyond the city limits. Sec. 689, R. S. The city could, as a matter of right, refuse to grant the authority for a passage through its streets of a railroad. It could also demand a price for the privilege. But it could also, as a matter of right, if it deemed the exercise of the power reasonable and proper, grant the right of way to a railroad extending its lines into other territory without a compensation in money but for other considerations.”
Section 4 of the act having made use of the word “ street railroad” in connection with the prohibition contained therein, defendant’s effort is to give such a definition to that term as would exclude the tracks authorized to be constructed and the road to be operated under Ordinance 10,392 from falling under the bar of the fourth section. The carrying of passengers within the limits of the city in contradistinction to the carrying of freight and passengers would seem to be, according to the defendant, the distinctive mark or characteristic of a street railroad. Our decision just cited is supposed to be decisive on that point, bub in this there is a mistake. It is true we allude to the fact that the East Louisiana Company carried “freight,” but that word has not the importance which defendant attributes to it — the next words “beyond the limits of the city,” and the words “ in their own cars,” have more signifi *1559 canee, and the use of these words must be read in connection with the subject matter the court was dealing with. The court was dealing with a special case, and held, that in that case and under the conditions and circurpstances shown, the Common Council had the power and authority to grant to the East Louisiana Railroad, without a money consideration (and that fixed as to amount by a bid at public auction), the privilege which it had accorded. The case was one of a simple “right of way” to an existing corporation having its domicile out of the city of New Orleans, with its legal character and its franchises as a railroad corporation already fixed, to continue or extend its line through the streets further into the city. The privilege originated in favor of the company no new resource of revenue, no change in its business was effected, and no additional traffic arrangements were authorized to be entered into. The ordinance took matters up just as they were and simply permitted the moving forward of the terminus of the road — nothing more; freight and passengers were not transferred to cars of another line for a consideration, or moved upon another line for a consideration, but were carried straight on upon the company’s own line, upon its own cars. We were called upon in the case cited to ascertain what the intention of the Legislature was in enacting the act of 1888, and reached the conclusion that its dominant idea was to deal with franchises or privileges having a money value, and franchises of such a character as would be the subject of competition if the way were left open for the public at large to obtain them at public auction. We reached the conclusion in that case that the privilege granted to the Eastern Louisiana, though it might have a value to the company, and though that value to it might induce it to make liberal offers to the city in one way or another for the purpose of receiving it (thus making it valuable also to the city) was none the less not a priviiege for which third persons would be likely to compete, and that therefore it was not within the contemplation of the act of 1888, which looked to an “ advertisement” and to “ competition ” as special factors in determining its prohibitory clauses. We did not decide that an existing railroad corporation carrying freight and passengers, having its domicile beyond the city and coming into it, could simply, by reason of those conditions, be authorized under ordinances of the city to construct a track or tracks from some point inside of its own line and circling *1560 the city, originate a new character of business inside its limits, and obtain, in and through the ordinance, new, separate and distinct sources of revenue. Under such circumstances, and to that extent, the foreign road would substantially be acting under a new franchise, not its old one.
Our decision substantially so declared. The view of this matter which we teok was similar to that taken by the Supreme Court of California in People vs. San Francisco & S. J. Railway Co., 44 Pac. 463.
Referring to a privilege such as was granted to the East Louisiana Company and a contention that, in order to make it valid it should have been put up at public auction, the court said “ that under the law ‘ they (the Common Council) can not grant the privilege to any but the highest bidder,’ and the highest bidder may be one who merely desires to prevent the road from passing through, and who can not make use of the franchise except for that purpose.
“ In fact the franchise sought is not the subject of competition. A particular railway company desires permission to construct its road through the town, or, in other words, to make a connection through the town of those portions of its road extending upon either side of the town to its opposite terminus. In the nature of things there can be no competition for this privilege. The builder of the road must build and operate the whole line. The right to do so is part of its corporate franchise, and how is it possible that any other person or corporation can acquire the right to construct or own and operate as a distinct and independent road and franchise that part of the road necessary to connect its two ends? This law was not intended to apply to such a case, but only to those cases. — of street railroads— in which bona fide competition is possible.”
If we compare the conditions existing at the time of the grant to the Eastern Louisiana road and the precise thing which it was authorized to do under its grant, with the conditions and circumstances existing when Ordinance No. 10,392 was passed, and with the objects and purposes to be accomplished under this last mentioned ordinance, it will be found they are essentially different. The very origin of the business which the new corporation is to transact is found in the ordinance itself — it is a local franchise, new, separate and distinct from any outside franchise, clearly valuable and for which the public would compete in money, if opportunity so to do *1561 were permitted. The city was not authorized to grant a privilege extending beyond its own limits. It had nothing to do with extensions beyond its own territory.
We do not think the General Assembly intended to use the words “ street railroad ” in any narrow technical sense, but that its evident purpose was to compel the city to make available for city purposes, and for the public benefit, in money, any local railroad franchise or privilege, which was valuable, and the amount to be derived from the granting of which was likely to be increased by being put up at public auction. So understanding to be the object of the lawmaker, it is our duty to give the statute a liberal construction in aid of its purposes, and this duty on our part carries with it an affirmance of the judgment appealed from, without the necessity of passing upon other questions raised in the controversy.
For the reasons herein assigned the judgment appealed from is affirmed.